**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SONNY O., Jr.,** by his mother and Next Friend Maria G., **DANIEL D.,** by his mother and Next Friend, Nadine D., and **VALERIE H.,** by her mother and Next Friend, Liliya H., | : : : : : : | **CIVIL NO. 1:14-CV-1110** |
| Plaintiffs, | : : | |
| v. | : : | |
| **THEODORE DALLAS,** in his official capacity as Secretary of Human Services of the Commonwealth of Pennsylvania, | : : : : : | ( Magistrate Judge Carlson) |
| Defendant. | : | |

**MEMORANDUM OPINION**

### I.   Factual Background and Procedural History

Two years ago today, the plaintiffs brought this lawsuit, a class action on behalf of 40,000 Pennsylvanians, families enrolled in Pennsylvania's medical assistance program whose children suffered from autism spectrum disorders. On behalf of this class of children, whose voices were stilled or impaired by autism, the plaintiffs sued the Department of Human Services, alleging that the failure to provide medically necessary Applied Behavioral Analysis (ABA) therapy to these children

in an amount, duration and scope sufficient to treat their disorders violated Title XIX of the Social Security Act. [1]

In a commendable recognition of a shared responsibility to address the needs of children and families seeking help in unlocking the medical riddles of autism, the parties promptly commenced settlement negotiations in this case. These negotiations were complex, and multi-faceted. They took into account clinical, legal and budgetary concerns. They examined a complicated array of legal, and regulatory factors, as well as examining the practical availability of ABA therapeutic resources in Pennsylvania. At the close of these negotiations, which spanned nearly 18 months, the parties tendered to the court for its consideration a proposed class action settlement agreement. (Doc. 71-2.)

This proposed settlement agreement was sweeping and sophisticated in its scope and comprehensive in its reach as it attempted to address questions of access to ABA therapy for the autism spectrum disorder community. On this score, the proposed settlement provided at least eight significant benefits for class members.

---

[1] ABA therapy is a nationally recognized treatment modality for autism spectrum disorders, which relies upon reinforcement, prompting, task analysis and other interventions to assist those experiencing autism spectrum disorders in developing essential social skills in the realms of behavior, communication, and social adaptive functioning.

First, under the terms of the settlement agreement, the Commonwealth created a designation for ABA services, permitting families to request, and providers to bill for these services through the Medical Assistance program.

Second, the agreement called for the issuance of a bulletin providing information to the affected autism spectrum disorder community, and various providers, regarding ABA therapy and its potential benefit in treating these disorders.

Third, the settlement agreement put in place a process for the revision of medical necessity guidelines in this field, in order to ensure that these guidelines do not impede access to these services but rather open the door to greater access to ABA therapy for families confronting autism.

Fourth, the settlement agreement established procedures for ensuring that those who provide ABA services possess sufficient skill, training, background and experience to meaningfully apply ABA therapy to the needs of the autism spectrum disorder community.

Fifth, the agreement prescribed enrollment procedures for ABA service providers, procedures which facilitate enrollment in the Medical Assistance program.

Sixth, the agreement called for on-going assessments of the ability of provider networks to meet the needs of the autism spectrum disorder community, and deliver meaningful ABA therapy to that community. This is a critical component of the

settlement, and one which ensures that the commitments set forth in the agreement are able to be translated into action in the field.

Seventh, the proposed settlement agreement created open, on-going, and transparent pathways for communication regarding progress and challenges in implementing this settlement. This communication is ensured through bi-monthly meetings by the parties designed to monitor the implementation of the program. In addition, under the terms of the agreement the Department of Human Services will create a dedicated point-person whose role it will be to address concerns of those seeking medical assistance for their autistic children.

Finally, the agreement provides for a useful oversight role by the court in this continuing process, and enables the parties to turn to the court to address and resolve any disputes which may arise relating to the implementation of this agreement.

Finding that this proposed agreement advanced the goals of this litigation in material ways we entered an order directing preliminary approval of the agreement, instructing the parties to provide notice to all potentially affected class members, allowing for class member comments on the proposed settlement agreement, and scheduling a fairness hearing on this agreement for June 6, 2016. (Doc. 74.)

The parties acted with dispatch in implementing this order. Thus, the Commonwealth mailed notice of the proposed settlement to more than 40,000

potential class members who could be affected by the settlement terms. Plaintiffs' counsel, in turn, fielded hundreds of inquiries regarding the settlement, its terms, and its positive impact upon the autism spectrum disorder community. At the conclusion of this preliminary notice process, the parties reported a remarkable, and remarkably strong, consensus supporting approval of the agreement. (Doc. 76.) Indeed, of the more than 40,000 class members notified, only three–less than .01%– submitted written comments critical of the settlement. In contrast, numerous class members filed written statements strongly supporting the settlement terms. These written statements spoke powerfully to the potential positive impact of ABA therapy on children with autism, and eloquently described how education and access to these services could change the trajectory of the lives of families confronting autism in ways which were enduring and good.

We then conducted a fairness hearing in this matter on June 6, 2016. In the course of this hearing we heard from parents, grandparents and family members of autistic children. These families spoke out on behalf of those whose voices have been stilled by autism spectrum disorders, providing compelling testimony concerning the benefits of ABA therapy, and the need for access to such treatment. These families also provided moving testimonials regarding the long, and often lonely, struggle of families affected by autism, underscoring the benefit of education and public

assistance in this field. In addition, we received commentary from ABA providers and others in the therapeutic community. These remarks underscored the value of adding ABA to the arsenal of treatments available for autism, and gave us a highly useful clinical perspective concerning the fairness of this settlement. Without exception, these concerned parties all endorsed the settlement proposal.

Indeed, no witness at the fairness hearing objected to the settlement proposal's goal of providing greater access to ABA therapy to families enrolled in the Medical Assistance program. Instead, the sole, isolated objection voiced at the hearing came from a single source, who applauded the goals of the settlement, but recommended that the settlement also address autism care in schools, and provide specific funding directives to the parties and others.

Thus, at the close of the hearing we were presented with a complex, comprehensive settlement proposal, which achieved multifaceted relief for the parties, enjoyed the support and acceptance of 99.99% of the 40,000 potential class members identified by the parties, and whose benefits had been described in powerful, compelling and eloquent ways by those who had appeared and testified on behalf of the approval of the agreement.

The fairness hearing also underscored for us a basic truth: For children experiencing autism spectrum disorders, and their families, each passing day is

precious in terms of securing care and treatment which may assist these children whose voices are stilled by this disease. Mindful of this fact, after careful consideration of all of the relevant factors under Rule 23(e) of the Federal Rules of Civil Procedure, on June 7, 2016, we approved this settlement, (Doc. 78.), for the reasons described in greater detail in this Memorandum Opinion.

## II. Discussion

Rule 23(e) of the Federal Rules of Civil Procedure prescribes the process for approval of proposed class action settlements and provides as follows:

> (e) Settlement, Voluntary Dismissal, or Compromise. The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P., Rule 23(e).

The legal benchmarks which we must apply in making this judgment have recently been outlined for this court by the court of appeals in In re Nat'l Football League Players Concussion Injury Litigation. In In re Nat'l Football League Players Concussion Injury Litigation the court of appeals explained that in taking on this task we are to apply legal benchmarks known as the Prudential and Girsh tests and:

> [N]oted nine factors to be considered when determining the fairness of a proposed settlement: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of

8

reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

(internal citation omitted). "The settling parties bear the burden of proving that the . . . factors weigh in favor of approval of the settlement." In re Pet Food Prods., 629 F.3d at 350. A district court's findings under the Girsh test are those of fact. Unless clearly erroneous, they are upheld. Id.

Later, in Prudential Insurance we held that, because of a "sea-change in the nature of class actions," it might be useful to expand the Girsh factors to include several permissive and non-exhaustive factors:

[1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

148 F.3d at 323. "Unlike the Girsh factors, each of which the district court must consider before approving a class settlement, the Prudential considerations are just that, prudential." In re Baby Prods., 708 F.3d at 174.

In re Nat'l Football League Players Concussion Injury Litig., No. 15 2206, 2016 WL 1552205, at *17-18 (3d Cir. Apr. 18, 2016), as amended (May 2, 2016).

9

Applying these legal and prudential considerations to the settlement reached in this case, we find by clear and convincing evidence that all of the relevant benchmarks[2] defined by case law plainly favored approval of this particular settlement.

Turning first to the complexity, expense and likely duration of this litigation, contested litigation of this case would have been inordinately complex, and would have entailed prolonged discovery, extensive motions practice, and the assessment of complicated medical proof.  The difficult and challenging factual aspects of this litigation would have been matched by the legal complexities of the case, which would have entailed applying scientific evidence to make legal-medical decisions against the backdrop of an intricate legal and regulatory regime for medical assistance programs.  The results of this litigation would have been uncertain, the costs of the litigation would have been enormous, and the human toll in terms of years of extended delay in reaching a resolution would have been inappropriate and intolerable for the families seeking ABA therapy for loved ones struggling with autism.  This factor clearly favored approval of the settlement.

---

[2]We note that a number of these factors, which relate to settlement of damages claims, have no application here since this lawsuit sought only prospective injunctive relief on behalf of class members.

Second, the reaction of the class to the settlement was overwhelming positive, yet another factor which strongly favored approval of the settlement. Indeed, given the complexity of the issues in this case, and the powerful emotional component of this litigation for class members seeking clues to the medical riddle of autism, it is extraordinary that a proposed settlement as sweeping and comprehensive as the settlement tendered to this court enjoyed the tacit acceptance or active support of 99.99% of the 40,000 class members.[3]

---

[3] While we note the overwhelming support voiced for this proposal by class members, we have not limited our analysis of this settlement to simply quantifying the number of supporters and opponents. We have also carefully considered qualitatively the objections voiced by the four isolated objectors in this case. In this regard, only one objector voiced a concern regarding the efficacy of ABA therapy as a treatment modality. This single isolated objection did not warrant rejection of the settlement for two reasons. First, this single voice was far outweighed by the chorus of voices testifying to the potential positive benefits of ABA. Moreover, this single objection to ABA failed to take into account that the settlement does not mandate ABA therapy, it just provides access to that therapy. Thus, families remain free to choose other pathways to treatment of childhood autism. This settlement simply adds another weapon, ABA, to the arsenal combating this disease. In addition, while one objector alleged that the settlement should have included schools, we note that schools and the Department of Education were not included as parties in this lawsuit for reasons that were good and sound. Therefore, this suggestion is simply not realistic. In any event, the Department of Human Services, when assessing need for services under this settlement will coordinate with educators, thus ensuring an appropriate continuum of care between the state, the schools, and families. Finally, to the extent that one objectors sought to have specific funding levels incorporated into the agreement, given the vagaries of the state budgeting process, prescribing funding levels was not feasible. However, the result is achieved in another way in the settlement agreement. The Commonwealth has committed itself in this agreement to

Consideration of the stage of these proceedings, and the status of discovery also weighed in favor of approval of the settlement. While the parties prudently chose to avoid the time, expense and delay of formal discovery, the parties engaged in extensive discussions spanning 18 months, at times involving clinicians on both sides, addressing a myriad of concerns and barriers to potential resolutions. All parties were fully informed regarding the factual considerations in this litigation, and plaintiffs and their counsel had adequate knowledge to assess the merits of the case and potential remedies, as they made what we regarded as astute and fully informed decisions about the adequacy of the settlement agreement.

We also concluded that any assessment of the risks of litigation, and the challenges of maintaining a class action, strongly militated in favor of resolution of this case through the settlement reached by the parties. As we have noted, this case presented daunting legal and factual complexities in terms of its medical proof, and the application of the medical evidence to a complex legal, regulatory system governing provision of medical assistance services. The process of amassing this evidence would have been protracted and costly; the presentation of this proof would have been complicated and difficult; and the outcome of the litigation would have

---

reaching certain treatment goals. We are confident that the Commonwealth will doubtless exercise its discretion in allocating resources to reach those court-mandated, and agreed-upon goals.

been unclear. Moreover, a finding of liability, if it had been attained, would have only spelled the beginning of this litigation. Fashioning a remedy for any claimed violation would have been at least as complicated as the process of litigating liability issues. Furthermore, at the end of this process, any remedy fashioned by the court in contested proceeding may not have been as sweeping and comprehensive as the relief attained in this settlement, and would have delayed relief for these plaintiffs for many years.

In addition, we believe that it is undeniable that the reasonableness of the settlement, viewed in light of the best potential recovery and attendant risks of litigation, called for approval of the proposed settlement. The agreement affords plaintiffs and class members relief that addresses each core concern raised in the complaint, and given the attendant risks of litigation including, but not limited to, the risks on the merits and the delays that would accompany further litigation and appeals, the agreement's benefits to class members are significant and weigh strongly in favor of final approval.

Finally, we found that the provision of attorneys' fees set forth in the agreement was entirely reasonable and there were no objections to the stipulated fees. Therefore, finding that all of the statutory, legal and prudential considerations which govern settlement of class claims favored approval of this particular settlement, and

further concluding that adequate notice of the proposed settlement was provided to more than 40,000 families of potential class members – all that could reasonably be identified – we approved the terms of this settlement agreement.

In doing so, we noted that the settlement, in our view, reflected a collective effort to achieve a solemn and shared responsibility: the duty to give voice to those who could not otherwise be heard. This duty was shared by the many parents, grandparents, family members and care-givers who spoke out on behalf of this settlement and the children afflicted with autism spectrum disorders, giving voice to the needs of these children who are robbed of the ability to speak for themselves due to autism. It was a duty undertaken by plaintiffs' counsel, who have acted in the highest traditions of the legal profession over the past two years by bringing and resolving this case with great skill and compassion. It was also a duty shouldered by the Commonwealth defendants in a fashion that is worthy of praise. From the outset of this litigation the Commonwealth joined with the plaintiffs to seek out a path which placed the interests of these children first and foremost.

By sharing in this responsibility to give voice to a class that could not speak for itself these parents, plaintiffs and public officials have established a framework which creates the promise of additional care and treatment for these children. While the families who testified at the fairness hearing acknowledged that no single

treatment is a panacea, unlocking the barriers created by autism disorders, this settlement provides three elements of inestimable value to these families: help, hope, and the assurance that they are not alone. It is, therefore, a legal framework that by any measure constitutes a fair, reasonable and adequate resolution of this litigation, and for these reasons is approved by this court.

*S/Martin C. Carlson*
MARTIN C. CARLSON
United States Magistrate Judge

DATED: June 9, 2016